J-S20032-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.L.-D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 380 MDA 2021 |

Appeal from the Decree Entered March 10, 2021
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s):  2020-02336

BEFORE:  NICHOLS, J., KING, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:          **FILED:  AUGUST 12, 2021**

C.L.-D. ("Father"), appeals from the Decree granting the Petition filed by the Lancaster County Children and Youth Service Agency ("CYS") to involuntarily terminate Father's parental rights to his child, A.L. ("Child") (a male born in February 2019), with K.A.B. ("Mother"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), and (b).[1]  We affirm.

Child was born to Mother and Father in February 2019.[2]  Relevant to this appeal, on December 1, 2020, CYS filed a Petition to terminate the

_____

[1] On March 2, 2021, Mother voluntarily terminated her parental rights to Child. N.T., 3/2/21, at 4-11.  Mother has not filed a brief in Father's appeal, nor has she filed an appeal from the termination of her parental rights.

[2] We note that, while pregnant with Child, Mother was arrested on multiple charges related to the physical abuse of another child, for whom Mother was the caretaker but not the natural mother.  N.T., 3/2/21, at 13.

parental rights of Mother and Father to Child.[3]  On March 2, 2021, the trial court held an evidentiary hearing on CYS's Petition.  At the time of the hearing, Child was two years old and resided with Child's six-year-old cousin and his maternal great-aunt, who wished to adopt Child.  Present at the hearing were Tamara E. Hogan, Esquire ("Attorney Hogan"), for CYS, and JoAnne Murphy, Esquire ("Attorney Murphy"), the guardian *ad litem*/legal interest counsel ("GAL"), for Child.  Father, who was in prison at the time of the hearing, participated with his counsel via telephone, and Mother participated via videoconferencing with her counsel.  CYS presented the testimony of permanency caseworker Sophia Maples ("Maples"), and Father testified on his own behalf.

_____

[3] On April 21, 2021, CYS filed a Motion requesting that this Court remand this matter in order for CYS to supplement the record, after CYS inadvertently failed to offer the juvenile dependency record into evidence as an exhibit at the evidentiary hearing.  This Court denied CYS's Motion.  In its Opinion, the trial court detailed the history of this appeal regarding the underlying dependency action, and suggested that this Court, operating under concepts of judicial economy and judicial notice, accept the trial court's unchallenged consideration of the dependency proceedings.

This Court will not take judicial notice "of records in another case, even when the case arose in the same court and the contents of the records are known to the court," nor will we "take judicial notice of evidence of which the trial court was not requested to take judicial notice."  *In re Estate of Brockerman*, 480 A.2d 1199, 1202 (Pa. Super. 1984) (citation omitted).  However, the parties do not dispute that Child was adjudicated dependent on March 19, 2019, and that a series of permanency review hearings followed the dependency adjudication prior to CYS's filing of the Petition seeking to involuntarily terminate Father's parental rights.

The trial court made the following findings of fact regarding the termination Petition from the testimonial and documentary evidence at the termination hearing that it deemed credible:

Child was placed into the physical custody of [CYS] on February 27, 2019. [] Child was placed as a result of Mother and [Father] residing together in a home when Mother received the previously[-]referenced criminal charges of a physically abusive nature [against a child who was not Child]. [CYS] attempted to conduct a home study of the family's residence, but [Father] was not responsive to [CYS]'s telephone calls or voicemail messages and was not present for an unannounced home visit. At that time, [Father] indicated that he was "moving his stuff to his sister's house … on South [] Street." Prior to that relocation, [Father] admitted to living in a home with Mother ….

[Father] testified that he was unable to receive any of [CYS]'s telephone calls or voicemail messages because his "phone contract was in [Mother's] name" and she was incarcerated. [Father] indicated that none of the household bills were paid and his cellular telephone had been disconnected due to Mother's incarceration. It is noted that [Father] made no attempt to reactivate his telephone.

After [] Child had been adjudicated dependent, the court approved a child permanency plan for [Father] with goals for reunification. [CYS] was unable to maintain ongoing contact with [Father], despite his reunification goals. As previously noted, [Father's] last successful period of visitation with [] Child occurred on April 17, 2019. Thereafter, [CYS] did not have contact with [Father] again until June 25, 2019. During a telephone call with the caseworker, [Father] indicated that he did not have contact with [CYS] from April to June[,] because he "[wanted] to lay low as his parole and probation officer was very strict, and [he was not] to have contact with the police" []. [Father] further reported that police officers were "showing up" to his parent/child visits at [CYS] to ask him questions regarding Mother's pending criminal charges. Accordingly, the [trial] court finds that, during this time, [Father] intentionally failed to maintain contact with, or actively participate with, [CYS] in an effort to complete the goals of the court-approved child permanency plan.

- 3 -

A meeting was scheduled for July 3, 2019[,] for [Father] to meet with the caseworker [and] address his permanency goals. [Father] failed to appear for that meeting. The meeting was subsequently rescheduled for July 9, 2019. [Father] again failed to appear. [Father] could not provide any explanation for his absence from both scheduled appointments. It is noted that [Father] was not incarcerated at the Lancaster County Prison until the end of August 2019.[4] [Father] made no attempts to contact [CYS] or [] Child during that time.

[Father] contends that, prior to his incarceration, he was receiving drug and alcohol counseling at "128 East Orange Street." He was unable to articulate the name of the counselor or the duration of his attendance in any such counseling. [Father] later clarified that such treatment occurred prior to [] Child's birth, although he maintained his attendance until March of 2019. No evidence was presented to substantiate these claims. [Father] testified that "his insurance ran out," as the reason he stopped attending counseling. When questioned, [Father] evasively indicated that Mother set up his insurance, he was unsure how to set up new insurance, and his mother (Paternal Grandmother) was going to set up his new insurance, but never did.

[CYS] was unable to make contact with [Father] again until October 1, 2019. At that time, [Father] was incarcerated at the Lancaster County Prison. Following an in-person meeting at the prison, [Father] signed all necessary release paperwork so as to permit the scheduling of a psychological evaluation, which could be conducted at the prison. Before the evaluation could be scheduled, [Father] was transferred to a federal detention center. While at the federal prison, [Father] reported he had the ability to complete a drug and alcohol program, although he never enrolled in that program. At the time of the evidentiary hearing, [Father] had also failed to complete a mental health evaluation or any related treatment. Moreover, on February 25, 2021, [Father] was reassigned to a "special housing unit" within the prison due to his intentional disobeying an officer's orders. While in the specialized unit, [Father] was ineligible for treatment programs. [Father]

_____

[4] On November 21, 2019, Father was indicted in the United States District Court for the Eastern District of Pennsylvania on criminal charges related to his alleged participation in an armed robbery of a Lyft driver in Lancaster County. *See* Petitioner's Exhibit 1; N.T., 3/2/21, at 3, 31.

alleged that he did complete a drug and alcohol program but failed to provide [CYS] with such documentation. With respect to [Father's] crime[-]free goal, [Father] incurred new criminal charges related to the August 2019 incident. [Father] reported that, if convicted, he expects to be incarcerated from anywhere between one-hundred and twenty-one to one-hundred eighty-one months (approximately ten to fifteen years). The record also reflects that [Father] has not started working on the following goals: learning and using good parenting; providing financially for himself and his Child; obtaining and securing appropriate housing; or demonstrating an ongoing commitment to [] Child. [Father] has consistently failed to provide any proof of income or bank statements for the period of time he was not incarcerated. Moreover, [Father] has not visited with [] Child since April [] 2019. It is specifically noted that [Father] was not incarcerated on the date of [] Child's initial placement with [CYS].

    … [Father] has not provided any gifts, letters, or communication to his Child. When confronted with such information, [Father] incredibly testified that "he was not aware [he] was allowed to have contact with [Child]." [Father] had been provided with a telephone number to reach [] Child for telephone visits; however, he has failed to reach out in any manner. [Father] curiously maintains that he did not visit or contact [Child] due to "getting harassed by the police." [*sic*]; however, he also testified that the police were present only at his last visit with [Child] (in April [] 2019). [Father] also stated that [] Child's caseworker recommended that he speak to the police. [Father] made the unilateral decision to stop visiting [] Child thereafter. To date, [Father] is uncertain as to when he may be released from federal prison[,] although he estimates it will take at least two years to go to trial. Upon his release, [Father] indicated that he would like to work with his friend to open a storefront for a clothing line. [Father] has no plans as far as housing or other income.[FN] It is also noted that in his testimony regarding his "future plans," [Father] failed to testify regarding his goals relative to [] Child.

_____

[FN] It is noted that [Father] has a second child with a different biological mother. [Father] did not testify to any instances of communication or maintaining contact with that child.

_____

Trial Court Opinion, 4/23/21, at 11-14 (internal citations omitted, one footnote added, one footnote in original).

On March 10, 2021, the trial court entered the Decree granting the Petition to involuntarily terminate Father's parental rights. On March 29, 2021, Father filed a Notice of Appeal, along with a Concise Statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[5]

In his brief on appeal, Father raises the following issue:

> Whether the [trial] [c]ourt correctly found that [CYS] had met its burden of establishing with clear and convincing evidence that Father, who was incarcerated for a majority of the time period, failed or refused to perform his parental duties and would not be in a position to do so in the reasonable future[?]

Father's Brief at 8.[6]

In reviewing an appeal from a decree terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011)

---

[5] On June 4, 2021, CYS and the GAL filed a joint brief arguing that this Court should affirm the trial court Order.

[6] Although Father does not specifically reference sections 2511(a)(1) or (2) in his Concise Statement and Statement of Questions Involved portions of his brief, we find his issue encompasses both of those sections, which he has discussed in the Argument section of his brief.

(plurality). As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re I.E.P.*, 87 A.3d 340, 343-44 (Pa. Super. 2014) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012)).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without

hesitance, of the truth of the precise facts in issue." *Id.* (quoting *In re J.L.C.*,
837 A.2d 1247, 1251 (Pa. Super. 2003)).

"Satisfaction of the requirements in only **one** subsection of Section
2511(a), along with consideration of the provisions in Section 2511(b), is
sufficient for termination." *See In re Z.S.W.*, 946 A.2d 726, 729 (Pa. Super.
2008) (brackets and citation omitted).   Here, we consider sections 2511(a)(1)
and (b), which provide, in relevant part, as follows:

> **§ 2511.  Grounds for involuntary termination**
>
> **(a) General rule.--**The rights of a parent in regard to a child may
> be terminated after a petition filed on any of the following
> grounds:
>
> > (1) The parent by conduct continuing for a period of at least
> > six months immediately preceding the filing of the petition
> > either has evidenced a settled purpose of relinquishing
> > parental claim to a child or has refused or failed to perform
> > parental duties.
>
> * * *
>
> **(b) Other considerations.--**The court in terminating the rights
> of a parent shall give primary consideration to the developmental,
> physical and emotional needs and welfare of the child.  The rights
> of a parent shall not be terminated solely on the basis of
> environmental factors such as inadequate housing, furnishings,
> income, clothing and medical care if found to be beyond the
> control of the parent.  With respect to any petition filed pursuant
> to subsection (a)(1), (6) or (8), the court shall not consider any
> efforts by the parent to remedy the conditions described therein
> which are first initiated subsequent to the giving of notice of the
> filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

In the present case, Father first contends that the trial court erred in finding grounds for termination pursuant to section 2511(a)(1). Father's Brief at 12-17. Father asserts that the trial court overlooked evidence of his progress on his child permanency plan, and failed to consider the obstacles Father faced, such as the COVID-19 pandemic's impact on his ability to access resources in prison to address his permanency plan goals. *Id.* at 15-17.

With respect to subsection 2511(a)(1), our Supreme Court has held as follows:

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re B., N.M.*, 856 A.2d 847, 854-55 (Pa. Super. 2004) (citations omitted).

The focus of involuntary termination proceedings is on the conduct of the parent and whether that conduct justifies a termination of parental rights. *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa. Super. 2001). Although the statute focuses on an analysis of the six months immediately preceding the filing of the petition, the court must consider the whole history of a given case and may consider a parent's inaction before the six-month statutory provision. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008). Additionally, "[t]he court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of [her] parental rights,

to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." ***Id.*** (citations omitted).

With regard to a parent's incarceration, in ***In re Adoption of S.P.***, our Supreme Court reiterated the standard of analysis pursuant to section 2511(a)(1) for abandonment and added as follows:

> [a]pplying [***In re: Adoption of McCray***, 331 A.2d 652, 655 (Pa. 1975),] the provision for termination of parental rights based upon abandonment, now codified as [section] 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." [***Id.***] We observed that the father's incarceration made his performance of this duty "more difficult." ***Id.***

> * * *

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

***In re Adoption of S.P.***, 47 A.3d at 828. Further, the Supreme Court stated, "incarceration neither compels nor precludes termination of parental rights."

***In re Adoption of S.P.***, 47 A.3d at 828 (quoting ***In re Z.P.***, 994 A.2d 1108, 1120 (Pa. Super. 2010)).

Finally, this Court has repeatedly defined "parental duties," in general, as the affirmative obligation to provide consistently for the physical and emotional needs of a child:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty ... requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

*In re B., N.M.*, 856 A.2d at 855 (citations and internal paragraph breaks omitted).

In its Opinion, the trial court analyzed termination pursuant to section 2511(a)(1) as follows:

In the matter at bar, [Father] contends that many of the resources offered were unavailable to him due to the COVID-19 pandemic. [The trial] court disagrees. This case was instituted in February[] 2019, prior to [Father's] current incarceration or the onset of the ongoing public health situation. The court approved a child permanency plan for [Father] on March 19, 2019. Since that time, [Father] has failed to actively engage with [CYS] resources or follow up with provided referrals. [Father] vaguely discussed a drug and alcohol program he was involved in prior to his incarceration, although the court finds such testimony evasive, lacking specifics, and not of a credible nature. Since his period of incarceration, [Father] has testified that: 1) programming is not available; 2) [] programs were available, but not running; and, [*sic*] 3) programs were available and he was on the waiting list to enroll. N.T., 3/2/21[,] at 39-40)[ ](emphasis added). Such inconsistencies suggest [Father's] claims lack credibility and continue to demonstrate that [Father] has failed to actively address the goals of the child permanency plan.

Father's permanency plan included a goal of improving his mental health functioning to the extent that he could care for [] Child. It is noted that Father has candidly admitted his ongoing struggle with mental health concerns. Initially, Father expressed

- 11 -

interest in [CYS] assistance; however, he failed to follow up with any resources prior to his incarceration. While in prison, Father did complete a program entitled "Enjoying the Second Half of Life," although he has not participated in any appropriate mental health treatment. Father also had a goal to remain free from drugs and misuse of alcohol. To date, Father has failed to complete any drug and alcohol treatment subsequent to court approval of the child permanency plan. Father provided vague testimony regarding previous involvement with a program, but no evidence was presented to support Father's participation. Father has also not completed his parenting goal. Father has not participated in any parenting education classes, nor has he completed the prerequisites to start the program.

Father's permanency plan also contained a goal of remaining crime free. Father was federally indicted on four separate charges on November 22, 2019[,] relative to a criminal incident that occurred in August [] 2019. It is specifically noted that this alleged incident occurred during a time when Father failed to visit [] Child due to his desire to "stay off police radar" and to comply with his probation. Father is presently awaiting trial. Even prior to his current period of incarceration, Father has not maintained an ongoing commitment to [] Child. Father has only visited [] Child twice. Notably, Father had three scheduled visits with [] Child. He arrived late for two of those periods of visitation and failed to show up for the third appointment. Father has not sent any letters, gifts, drawings, or cards to [] Child. For the first time during his present period of incarceration, on September 15, 2020, Father requested one photo of [] Child. Father has failed to ask for photos prior to this time or request any updates regarding [] Child.

Father's plan also incorporated goals to be financially stable and to obtain a home free and clear of hazards for himself and [] Child. Since August 2019, Father has consistently been incarcerated at the Lancaster County Prison or a federal detention center. Prior to that, Father failed to provide any proof of income. The record does not reflect a time where Father held any type of gainful employment. During the evidentiary hearing, Father was unable to provide more than a cursory plan for employment after his incarceration. Moreover, Father has failed to maintain a stable residence since his involvement with [CYS]. It is noted that Father moved at least twice prior to his incarceration, was unable to be

located by [CYS] for an extended period of time, [*sic*] and is now situated in a federal detention center.

… [Father] has not demonstrated any progress towards improving his ability to parent. Here, [Father] has not demonstrated any commitment to future success as a parent. Notably, [] Child has not had meaningful contact with [Father] since birth. [] Child met with [Father] approximately two times prior to his first birthday. It is clear that termination of parental rights would not have a detrimental effect on [] Child, as [] Child lacks a firm understanding of the identity of his biological parents. Stated another way, [] Child's present pre-adoptive placement is the only "home" [] Child has ever known. Father has failed to express anything more than "hopes" and "wishes" to provide [] Child with essential parental care. Accordingly, [CYS] satisfied its burden pursuant to [section] 2511(a)(1).

Trial Court Opinion, 4/27/21, at 20-22.

There is competent, clear and convincing evidence to support the trial court's conclusion that Father failed to perform his parental duties for a period of six months prior to CYS's filing of the termination Petition. The trial court also properly considered Father's explanation for his conduct in abandoning Child; the post-abandonment contact between Father and Child; and the effect of termination of parental rights on Child pursuant to Section 2511(b), based on the discussion set forth in the trial court's Opinion. *See id.* The trial court's determination regarding section 2511(a)(1) is supported by competent, clear and convincing evidence in the record. Thus, we will not disturb the trial court's determination on appeal. *In re Adoption of S.P.*, 47 A.3d at 826-27; *In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Finally, we must determine whether termination was proper under section 2511(b). Initially, we note that even though Father challenged the

trial court's determination under section 2511(b) in his Concise Statement, Father's appellate brief contains no argument related to section 2511(b), nor is it referenced in Father's Statement of Questions Involved. *See* Father's Brief at 8, 12-18. Accordingly, Father has waived any challenge related to that section. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017) (stating that "[b]ecause Mother failed to include a challenge to [s]ection 2511(b) in her statement of questions involved and concise statements that issue is also waived") (footnote omitted). Nevertheless, in an abundance of caution, and mindful of Child's best interest, we have reviewed the record and conclude that the trial court did not abuse its discretion in finding that termination was appropriate under section 2511(b).

We have explained that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated the following:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

***In re: T.S.M.***, 71 A.3d at 267.

This Court has explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. ***In re Z.P.***, 994 A.2d at 1121. Further, this Court has stated that "a parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." ***In re B.,N.M.***, 856 A.2d at 856 (internal citations omitted). It is well settled that "we will not toll the well-being and permanency of [a child] indefinitely." ***In re Adoption of C.L.G.***, 956 A.2d at 1007 (citing ***In re Z.S.W.***, 946 A.2d at 732 (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

In its Opinion, the trial court stated the following:

> In this matter, [Father] has caused the Child to be without essential parental care. Notably, [] Child has had no contact with his biological [F]ather in over twenty-four months. It is further noted that [] Child was placed into the physical custody of the Agency at birth. As such, [] Child has not established any true bond with [Father]. [Father] has been absent for the entirety of [] Child's life. [Father] was not present at [] Child's birth and remained largely uninterested in [] Child's life until his period of incarceration. The court cannot consider the "hopes" of [Father]. Rather, the court must analyze what is best for [] Child.
>
> * * *
>
> … While [Father] seemingly has a limited history of drug abuse, he has demonstrated a continuing pattern of serious criminal activity, most recently in August [] 2019. In that

incident, [Father] is alleged to have held a Lyft driver at gunpoint in an attempt to steal money from the driver. The court is extremely troubled by [Father's] recent criminal activity, especially in light of [Father's] purported desire to "stay off police radar." In his testimony, [Father] justified his missed visitation with [] Child for that reason. [Father] did not want to "take the risk" regarding police contact. Despite that desire, [Father] allegedly engaged in criminal conduct resulting in his pending federal charges.

This court recognizes that the decision rendered is, no doubt, difficult for [Father]. That said, the decision was not rendered in haste, but, rather, is reflective of the totality of the evidence presented. It must be recognized that [] Child has spent his entire, albeit short, life with his resource parent and truly has had no interaction with his biological [F]ather, as a result of the choices [Father] has made. There can be no doubt that this Child deserves to remain in a stable family that is ready, willing, and able to provide him with needed permanency and stability — things that [Father] simply cannot provide. The court simply cannot subject [] Child to any extended period of uncertainty in the hope that Father someday summons the ability to parent.

Trial Court Opinion, 4/27/21, at 25-26 (internal citations omitted).

After careful review, we would conclude that competent, clear and convincing evidence in the record supports the trial court's determination under section 2511(b). *See In re Adoption of S.P.*, 47 A.3d at 826-27; *In re: T.S.M.*, 71 A.3d at 267.

Accordingly, we affirm the Decree terminating Father's parental rights pursuant to section 2511(a)(1), (2), and (b).

Decree affirmed.

Judge King joins the memorandum.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>08/12/2021</u>